UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HEIDI RODRIGUEZ, et al.,

                                    Plaintiffs,

         v.                                        1:11-cv-1068

VILLAGE GREEN REALTY, INC., et al.,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiffs commenced the instant action against Defendants asserting various violations of the Fair Housing Act of 1968 as amended by the Fair Housing Amendments Act of 1988 ("FHA"), 42 U.S.C. § 3601, et seq. Presently before the Court are Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety and Plaintiff's motion for partial summary judgment.

## I.        BACKGROUND

Plaintiffs Heidi and Juan Rodriguez are the parents of minor child, A.R. Defendant Blanca Aponte is a licensed real estate broker in the State of New York. Defendant Village Green Realty, Inc. ("VGR") is a real estate brokerage agency. Beginning in 2002, Aponte owned and operated her own real estate brokerage agency, Casa Blanca Realty. On or about October 31, 2008, Casa Blanca Realty entered into an asset and purchase agreement with VGR. Under this agreement, all active listings of Casa Blanca Realty were transferred to VGR. This included a listing for real property located at 48 Kate Yaeger Road, Saugerties,

New York (the "Yaeger property.").[1]  Aponte was the listing agent for the Yaeger property.  In addition, Blanca Aponte became affiliated with VGR as an associate broker and continued to maintain her real estate broker's license under Casa Blanca Realty.

At all times relevant hereto, the Yaeger property was owned by Donnie Morelli.  In March 2009, Plaintiffs directly entered into a month-to-month lease with Morelli to occupy one of two single family homes located on the Yaeger property.  In January 2011, Mansour Farhandian became a prospective buyer of the Yaeger property.  Morelli insisted that he directly handle all negotiations with Farhandian.

At the request of Morelli, on January 20, 2011, Aponte wrote to Plaintiffs advising them that Farhandian was interested in purchasing the property and retaining them as tenants under certain modified terms.  The modified terms included increased rent, removal of Plaintiffs' property from the common garage, a $50.00 fee for storage of a trailer, removal of a trampoline or proof of adequate insurance coverage, a garbage disposal fee, and an agreement to permit periodic inspections of the premises.  The letter requested that if the proposed terms were "not agreeable, please be advised that this letter will serve as notice of at least thirty (30) days and you will be required to vacate the premises no later than March 15th, 2011."  Plaintiffs were asked to advise Aponte how they wished to reply to the terms outlined in the letter or the date of their vacating the premises.  Plaintiffs did not respond to Aponte's letter.  Plaintiff Heidi Rodriguez did speak with Morelli who is claimed to have responded that she should "not worry about it" and that he would "take care of it."

---

[1] The parties dispute the street number of the real property, but this disagreement is immaterial to the legal issues in the case.

On January 23, 2011, Morelli and Farhandian entered into an offer to purchase agreement. Pursuant to the agreement, a contract of sale was to be signed on or about February 15, 2011 with a closing in early March. Meanwhile, Aponte continued to attempt to contact Plaintiffs by leaving several telephone messages. Plaintiffs did not respond to Aponte's calls. Aponte then reached out to Heidi Rodriguez via text messaging on her cellular telephone. The two exchanged a series of text messages, the full contents of which are reproduced at the end of this Decision and Order.

It appears that on February 7, 2011, Aponte may have learned from Morelli that Plaintiffs' daughter experienced seizures. Some of the text messages between Aponte and Heidi Rodriguez reference Rodriguez's daughter's medical condition. For example, the following exchanges took place:[2]

> February 7, 2011:
> Aponte: While we are both sympathetic to your situation, it does not change the fact that we are selling the property and you have been given ample notice I will be proceeding with legal action to remove your from premises You've known from the beginning that the property has been on the market
> . . . .
>
> February 8, 2011:
> Rodriguez: 2/18 or 2/22 for the visual inspection. 1 pm is the best time.
>
> February 9, 2011:
> Aponte: How is 1:45 on 18th. U also need to confirm that u are leaving by 3/15
>
> February 12, 2011:
> Rodriguez: 2/18 @ 1:45 will be fine. We are not leaving. Where do you want us to go with a sick child? I thought the new owner wanted renters? Why do you keep on harassing and insisting that we move? I have paid the rent on time and have not used our security or other deposit. When you were told of my daughter being sick we weren't asking for free rent or anything of the sort. Just to be understood and

---

[2] Original formatting from the text messages has been preserved, including typographical errors and lack of punctuation.

left alone to deal with her medical issues without being bothered by you asking us to leave our home.

Aponte: I have not asked vou to leave! You made no response to agreeing to the terms of the new owner which include removal of stored items in garage! In fact the only response I got from you is about the inspection I plan to do the 18th for the buyer!

Rodriguez: It's funny how I can barely get my vehicle up the poorly maintained icy road - not to mention how many people got their cars stuck. How should I get a moving vehicle up here? Or better yet an ambulance for my daughter if needed?

Aponte: This has nothing to do with what we were just speaking about Fact is that if I can get up and down emergency vehicles should be able to as well. This has been an unusually cold and snow filled Winter. So maybe vou should consider relocating to a better and more easily accessible Location. I will see vou on the 18th at 1:45
. . . .

February 16, 2011:
Rodriguez: Just to clarify the appt was for Friday not Thursday - and sorry in advance but I must cancel. My daughter had another seizure and she has to go to Vassar Hosp on Friday for testing. Can you make it on Tuesday 2/22 same time?

Aponte: U r right, I meant Friday. What time are u back from appointment? How about your husband? Saturday works as well. Have you arranged for storage?
. . . .

Aponte: Just spoke w my lawyer for management company.. We will accept your rescheduling appointment for Friday if you provide verification of medical appointment for your daughter. The prospective new owner is very concerned about continuing your lease with you Childs medical situation and will probably not want to rent to vou. I think we need to let you know that we will not be renting to you! Please plan on rel Please make plans to relocate. We will give you Until end of March. Respond to me.. Not to mr Morelli Blanca

Rodriguez: What are you talking about?

Aponte: Exactly what I said. You have cancelled our appointment because of issues with your daughter's illness. We want verification of your appointment. That being said... The new owner has decided not to continue to rent to you because your daughter should be in a more convenient location to medical treatment

Rodriguez: You spoke to the new owner that fast and he made a decision not to rent to us because my daughter has seizures? Or is this you decision ? I am confused.

February 17, 2011:
Aponte: The new owner is concerned by your statement that emergency vehicles cannot reach vou should your daughter be at risk. Also concerned about you not making place readily available for inspection and thinks I should have a key that is the right of a landlord and his representative. For me, I only have your statement that your daughter us sick Do u have verification?
. . . .

February 23, 2011:
Rodriguez: Sure. I remember clearly. I then gave you dates to reschedule and you reply was that we needed to move out by the end of March because of our daughters medical issue. You never confirmed with me another date to come In and take pictures.

Aponte: Yes I never confirmed new date! However, I said the new owner was concerned about renting to you because of your statement that it was not a readily accessible to emergency vehicles! In fact he is convened about being a landlord to both houses because of issues concerning u guvs!!!

Byway. U did not respond! Are. Leaving or attempting to stay even though u said conditions are not good for your daughter and I also asked for verification of doctors appointment last Friday. Please submit
. . . .

Rodriguez: I was told the new buyer wanted tenants. When did he change his mind?

Aponte: When all these concerns came up about your daughter being seriously ill and emergency vehicles not being able to get to her! That is of major concern as to liability which you raised!! The fact that with notice, the place is not readily available for inspections You have not arranged for removal of things you stored in garage at no cost and as a temporary arrangement w current owner who also wants you to arrange for other storage
. . . .

I will be speaking to Donnie tomorrow. I hope you saved all our text conversations as I have. Do you have verification of doctor's appointment last Friday? Verification of daughter's illness? I think that your tenancy is over. Will verify after speaking to both Donnie and buyer

Rodriguez: Why would you think our tenancy is over? Donnie Morrelli has never asked us to leave or move our stuff from the garage. He is the current owner and he has never lead us to believe he wanted us to move. . . .

Aponte had not spoken with Farhandian when she represented to Plaintiffs that he was concerned about leasing to Plaintiffs because of A.R.'s disabilities. Similarly, Aponte had not spoken with Farhandian about terminating Plaintiffs' tenancy. Rather, Aponte made her statements out of concern that Plaintiffs might interfere with the sale of the real property and her opportunity to earn a commission. Other than what is contained in the text messages, Aponte never inquired about Plaintiffs' daughter's medical history or condition.

As of March 2011, Plaintiffs commenced making higher rent payments and provided proof of insurance for the trampoline. Morelli changed the lock on the garage while Plaintiffs still had personal property inside. Plaintiffs believed Aponte changed the lock, although it was Morelli who did so. Plaintiffs never contacted Aponte requesting access to the garage. Morelli provided Plaintiffs with a key to the garage upon request.

Ultimately, the deal between Morelli and Farhandian fell through. In or about July 2011, Aponte and VGR disaffiliated. Plaintiffs continued to remain on the property until they moved out in August 2011.

Plaintiffs commenced the instant actions against Defendants asserting various violations of the Fair Housing Act, 42 U.S.C. § 3604. Presently before the Court are Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Amended Complaint in its entirety and Plaintiffs' motion for partial summary judgment.

## II.     STANDARD OF REVIEW

The parties each move for summary judgment pursuant to Rule 56. It is well settled that, on a motion for summary judgment, the Court must construe the evidence in the

light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation.  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

With these standards in mind, the Court will address the pending motions.

III.    **DISCUSSION**

a.    **Whether A.R. is a Protected Person under the Fair Housing Act**

The Fair Housing Act makes it unlawful to discriminate in connection with the rental of housing on account of an individual's handicap.  The FHA defines the term "handicap" to mean:

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
>
> (2) a record of having such an impairment, or
>
> (3) being regarded as having such an impairment. . . .

42 U.S.C. § 3602(h). The phrase "physical or mental impairment" is expressly defined by applicable regulations to include epilepsy and autism. 24 C.F.R. § 100.201. Having a physical or mental impairment is not, however, enough. Rather, the impairment must substantially limit one or more of the person's major life activities. See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 47 (2d Cir. 2002). Applicable regulations define the phrase "major life activities" to mean "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 24 C.F.R. § 100.201. "[T]o be substantially limited . . ., an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002). The term "substantially limits" means that the limitation must be "significant" or to a "large degree." See Matarese v. Archstone Pentagon City, 795 F. Supp. 2d 402, 432 (E.D. Va. 2011), aff'd in part, vacated in part sub nom. Matarese v. Archstone Communities, LLC, 468 F. App'x 283 (4th Cir. 2012); Book v. Hunter, 1:12-CV-00404-CL, 2013 WL 1193865, at *3 (D. Or. Mar. 21, 2013). "A claim of medical disability must be supported by medical evidence. A plaintiff cannot rely on 'conjecture or surmise.'" Okoro v. Marriott Int'l, Inc., 07 CIV. 165 (DLC), 2008 WL 4449386, at *8 (S.D.N.Y. Sept. 29, 2008) (quoting Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir.1994)).

A person also may be found to be disabled within the meaning of the FHA if she is "regarded as having [a physical or mental impairment which substantially limits one or more major life activities]." 24 C.F.R. § 100.201. Under applicable regulations, an individual is "regarded as" having such an impairment if she:

> (1) Has a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by another person as constituting such a limitation;
>
> (2) Has a physical or mental impairment that substantially limits one or more major life activities only as a result of the attitudes of other toward such impairment; or
>
> (3) Has none of the impairments defined in paragraph (a) of this definition but is treated by another person as having such an impairment.

24 C.F.R. § 100.201.

> The "regarded as" prong is focused on "the impairment's effect upon the attitude of others." Gordon v. E.L. Hemm & Assocs., Inc., 100 F.3d 907, 913 (11th Cir. 1996). Put another way, this provision is "intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities." Id. "Regarded as" having a disability also requires that Defendants believed that [A.R.'s] impairment "substantially limited" her performance of a major life activity.

Solodar v. Old Port Cove Lake Point Tower Condo. Ass'n, Inc., 12-80040-CIV, 2013 WL 3892986 (S.D. Fla. July 26, 2013). An individual is "regarded as" disabled if the defendant "mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities" or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Adams v. Rice, 531 F.3d 936, 945 (D.C. Cir. 2008) (citation and internal quotation marks omitted); see also Hilton v. Wright, 673 F.3d 120, 128 (2d Cir. 2012) (noting that a person seeking to establish that she was "regarded as" disabled needed to show that she was perceived as both impaired and substantially limited in

one or more major life activity); <u>Whitehead v. United Parcel Service, Inc.</u>, 387 Fed. Appx. 16 (2d Cir. 2010).[3]

### 1. Whether A.R. is Substantially Limited in the Ability to Learn

Defendants first claim that A.R. does not fall within the Fair Housing Act's definition of "handicap." The crux of Defendants' argument is that, although A.R. has been diagnosed with epilepsy and a pervasive developmental disorder, those impairments, standing alone, are insufficient to establish a handicap under the statute. Defendants claim that Plaintiffs fail to point to sufficient evidence, admissible in form, that substantiates a medical condition that substantially limits a major life activity.

Plaintiffs respond that A.R. is substantially limited in the major life activity of learning. In support of their claim that A.R. is handicapped within the meaning of the FHA, Plaintiffs point to their own deposition testimony that they observed A.R. experiencing some difficulties when she was three or four. This testimony does not, however, describe any conditions that substantially limit a major life activity. Plaintiffs also point to testimony from Juan Rodriguez that A.R. required special assistance in school starting in her kindergarten year and that her condition "kind of snowballed after that." Once again, however, this testimony does not explain how A.R.'s condition may have substantially limited a major life activity.

---

[3] The Court notes that, in determining whether a person is disabled under the FHA, cases have largely followed the analyses applied in cases under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-213. <u>See</u> <u>Tsombanidis v. W. Haven Fire Dep't</u>, 352 F.3d 565, 573 n.4 (2d Cir. 2003). In 2008, Congress amended the ADA that broadened the scope of individuals who would satisfy the statute's "regarded as" definition of "disabled." <u>Hilton</u>, 673 F.3d at 128-29. Congress did not similarly amend the definition of "handicap" under the FHA.

Next, Plaintiffs point to certain medical and education records, to which Defendants object as inadmissible on the grounds that the records are not certified, are incomplete, and are not authenticated.  Pursuant to Fed. R. Civ. P. 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  The Second Circuit has explicitly stated that "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); see also Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (same).  "To be admissible, evidence must be authenticated-the party offering the evidence must offer proof 'sufficient to support a finding that the matter in question is what its proponent claims.'"  Gissinger v. Yung, CV-04-0534BMCJO, 2007 WL 2228153 (E.D.N.Y. July 31, 2007) (quoting Fed. R. Evid. 901(a)).  Here, Plaintiff offers nothing to authenticate the medical and educational records upon which they rely.  Hodges v. Keane, 886 F. Supp. 352, 356 (S.D.N.Y. 1995) ("Medical records . . . can be admissible under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated.").  Similarly, there is no indication that these records are complete and accurate copies of A.R.'s medical records.  Accordingly, these records are inadmissible in form and may not be considered in connection with the pending motions for summary judgment.

Even considering these records, they are insufficient to establish a medical condition that substantially limits one or more major life activities.  The records do establish that A.R. suffers from generalized nonconvulsive epilepsy with intractable epilepsy, Asperger's disorder, and pervasive developmental disorder not otherwise specified.  As

noted, however, that A.R. may suffer seizures and/or experience symptoms of Asperger's or of a developmental disorder does not automatically establish that her condition substantially limits a major life activity. See E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 352 (4th Cir. 2001); Spears v. E-Z Mart Stores, Inc., 12-CV-17-JED-TLW, 2013 WL 1309398, at *4 n.3 (N.D. Okla. Mar. 26, 2013); Ramos-Echevarria v. Pichis, Inc., 659 F.3d 182, 188 (1st Cir. 2011); Cash v. Smith, 231 F.3d 1301, 1306 (11th Cir. 2000); Deas v. River W., L.P., 152 F.3d 471, 479 (5th Cir. 1998); see also Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 47 (2d Cir. 2002); Quintero v. Rite Aid of New York, Inc., 09 CIV. 6084 JLC, 2011 WL 5529818 (S.D.N.Y. Nov. 10, 2011), reconsideration denied, 09 CIV. 6084 JLC, 2012 WL 10401 (S.D.N.Y. Jan. 3, 2012); Stebbins v. Legal Aid of Arkansas, 3:11-CV-03057, 2012 WL 5411148, at *4 (W.D. Ark. Nov. 6, 2012), aff'd, 512 F. App'x 662 (8th Cir. 2013) Ziehm v. Radioshack Corp., CIV. 09-69-P-S, 2010 WL 2079550 (D. Me. May 22, 2010), report and recommendation adopted, CIV 09-69-P-S, 2010 WL 2680024 (D. Me. July 1, 2010); Landry v. United Scaffolding, Inc., 337 F. Supp.2d 808 (M.D. La. 2004). Rather, there must be an individualized inquiry into the effects of A.R.'s conditions on her major life activities. See Dadian v. Village of Wilmette, 269 F.3d 831, 837 (7th Cir. 2001) ("Whether a plaintiff has an impairment and whether it substantially limits a major life activity is to be decided on a case-by-case basis."); U.S. v. Southern Management Corp., 955 F.2d 914, 918 (4th Cir. 1992) (same).

Again, Plaintiffs argue that A.R.'s medical conditions substantially limit the major life activity of learning. In support, they submit records from treating neurologist, Dr. Castaneda. Records from Dr. Castaneda's office show essentially normal neurological exams. CT scans have been "unremarkable." There is one record from November 5, 2010, which is from

A.R.'s initial visit with Dr. Castaneda, in which it is noted that "[t]hese [possible seizures] apparently happen multiple times a day, and apparently are beginning to affect her school work as her grades are deteriorating." This notation appears to be based upon reports from Plaintiffs and not based on any medical evaluation of the effects of A.R.'s medical condition or a review of A.R.'s scholastic performance. Nothing in the records provides any objective support for the conclusion that A.R.'s grades were deteriorating. None of Dr. Castaneda's later records mention any issues with respect to learning. While there are some notations in the "history" portion of the records that A.R. is "very moody and has become depressed" on her medication, the records also note that A.R. is talkative and engaging. Dr. Castaneda described her mental status as "awake, alert and cooperative." In short, these records do not adequately address any limitations in the major life activity of learning.

Plaintiffs also submit a May 10, 2009 assessment by Dr. Monica Beyer, a developmental-behavioral pediatrician. That assessment notes that, in school, A.R. received "push-in services for reading, writing and mathematics. She gets extra time for tests. . . ." Dr. Beyer's mental status exam revealed that A.R. appeared age appropriate. She was found to have normal attention span and concentration. Dr. Beyer noted "[n]o sensory issues during session, but significant sensory processing problems based on history, primarily hyperreponsive." Dr. Beyer found A.R.'s thought processes to be normal and age-appropriate, along with an age-appropriate fund of knowledge. Her memory was intact and her intelligence was found to be average to above-average. Dr. Beyer did note issues with

anxiety and relating to others.  Dr. Beyer tested for pervasive development disorder and

found that A.R. scored in the moderate range.[4]  Dr. Beyer expressly found that A.R. has

> average to somewhat of a problem with overall school performance.  Writing is the
> area deemed problematic.  Math is average to above average when [A.R.] has
> sufficient time.  Reading is average. . . .

Dr. Beyer found deficits in communication in that she has a good vocabulary, but often

engages in a one-way conversation, her speech volume is too loud, and there is a disregard

for personal space and lack of social etiquette.  Although the pervasive developmental

disorder is noted to impact her performance at school, there is no quantification of any such

limitation.  Dr. Beyer recommended accommodations at school "that lessen the impact of her

anxiety on her academic performance."  In short, Dr. Beyer's report is insufficient to establish

a significant limitation in A.R.'s ability to learn.

Plaintiffs also submit a report from an occupational therapist who notes that A.R.'s

"biggest area of difficulty in school appears to be her behavior."  Again, however, this report

does not, directly or indirectly, indicate a significant limitation in learning.

Plaintiffs also submit the affidavit of Irene Flatau, M.D., a pediatrician that treated

A.R. since December 2011.  Dr. Flautau's affidavit states that "A.R.'s medical history shows

that she has been diagnosed with epilepsy since 2010.  This causes her to experience grand

mal seizures, the most intense type of seizure, during which she loses consciousness and

suffers violent muscle contractions, as well as petit mal seizures, also known as 'absence'

seizure, during which a person briefly and suddenly lapses into unconsciousness."  Dr.

Flatau further stated that "A.R. has been diagnosed with Autism Spectrum Disorder."  While

---

[4] These results were based on a test completed by A.R.'s mother; not an objective assessment of A.R..

these records establish A.R.'s impairments, they do not adequately address the limiting effects of those impairments.

Assuming, *arguendo*, that these medical and/or scholastic records are properly considered in connection with the pending motions for summary judgment, considering them in totality, the Court finds that they are insufficient to permit a fair minded trier of fact to reasonably conclude that A.R. is substantially limited in her ability to learn. Aside from a passing statement in Dr. Castaneda's records that A.R.'s conditions "apparently are beginning to affect her school work as her grades are deteriorating," there is no objective assessment or indication of the degree of any affect of A.R.'s impairments on her school work or learning ability such that it can reasonably be said that any limitation is substantial. Dr. Castaneda's records do not otherwise support a finding of a substantial limitation in the ability to learn. There is nothing in his records indicating the manner or extent in which A.R.'s medical condition impacts her ability to learn. Dr. Beyer's assessment is more on point, but, overall, finds that A.R.'s aptitude levels are age-appropriate. Dr. Beyer expressly found that A.R. is "average to somewhat of a problem with overall school performance." A finding of "average to somewhat of a problem" is less than the "substantial" limitation necessary to have a disability within the meaning of the FHA. Dr. Beyer opined that A.R. would require additional time to complete tasks to help reduce the effects of her anxiety. This does not suggest a substantial limitation. The opinion of the occupational therapist says very little concerning the extent of any limitation in A.R.'s ability to learn. Dr. Flatau provides no assessment or opinion concerning the effects of A.R.'s medical impairments on her ability to learn. The recommendations in A.R.'s individualized education plan are insufficiently severe to reasonably permit the conclusion that she is substantially limited in the major life activity of

learning. Lastly, there is an unsigned April 28, 2011 letter from Dianielle Cigliano, D.O. that, aside from being inadmissible,[5] similarly provides no indication of the extent of any limitations on A.R.'s ability to learn.

For the foregoing reasons, the Court finds that there is insufficient evidence from which a fair minded trier of fact could reasonably conclude that A.R.'s impairments substantially limit the major life activity of learning.

## 2. Whether Defendants Regarded A.R. as Having an Impairment that Substantially Limits a Major Life Activity

Defendant also claims that there is insufficient evidence that Aponte regarded A.R. as having a handicap. Plaintiffs claim that there is proof that Aponte regarded A.R. as being disabled, but do not clearly articulate how, other than claiming that "Aponte's text messages demonstrate that she regarded A.R. as a person with disabilities, *and* that these disabilities somehow made the Rodriguez Family less desirable tenants." Pl. Mem. of Law at 12.

While there is evidence that Aponte was aware of A.R.'s medical condition (at least to some extent) at the time she exchanged text messages with Heidi Rodriguez and that Aponte was aware that A.R. was experiencing seizures, there is insufficient evidence suggesting that Aponte: (i) treated A.R.'s condition as if it substantially limited a major life activity, see 24 C.F.R. § 100.201(d)(1),(3); or (ii) expressed an attitude that caused A.R. to have a substantial limitation of a major life activity. 24 C.F.R. § 100.201(d)(2). Indeed, there is insufficient evidence suggesting that Aponte believed A.R. to be limited in any way, treated her as if she was so limited, or expressed an attitude causing such a limitation. The only

---

[5] In addition to being unsigned, there is no indication in the record who Dr. Cigliano is or the extent of her relationship with A.R. Plaintiffs submit no medical records from Dr. Cigliano.

limitations expressed concerning A.R.'s medical condition was with respect to the ability of an ambulance to traverse the driveway in the winter and convenience to medical care; not whether A.R. was limited with respect to a major life activity. Aponte stated that "the prospective new owner is very concerned about continuing your lease with your Childs [sic] medical situation and will probably not want to rent to you," and that "your daughter should be in a more convenient location to medical treatment." Those statements were made after Aponte suggested that Plaintiffs' lease would be terminated and, in response, Heidi Rodriguez's questioned whether a moving truck or an ambulance would be able to make it up the snowy driveway. During the course of the text messages, Aponte questioned whether A.R. actually suffered from any ailment and stated that "[t]he new owner is concerned by your statement that emergency vehicles cannot reach you should your daughter be at risk."[6] There can be little doubt that Aponte's statements were wholly inappropriate. That being said, Aponte's statements cannot reasonably be said to evidence archaic attitudes, erroneous perceptions, or myths that have the effect of disadvantaging persons with, or regarded as having, disabilities. They similarly do not suggest mistaken beliefs that A.R. has a physical or mental impairment that substantially limits one or more major life activities, or that an actual, nonlimiting impairment substantially limits one or more major life activities. Accordingly, the Court finds that there is insufficient evidence upon which a fair minded trier of fact could reasonably conclude that Aponte regarded A.R. as having a handicap.

---

[6] As previously noted, neither Moretti nor Farhandian expressed any such concerns.

For the foregoing reasons, the Court finds that A.R. does not have a "handicap" within the meaning of the FHA.  Accordingly, her claims under §§ 3604(c), (d), and (f) are DISMISSED.

**b.      42 U.S.C. § 3617**

Defendants next move to dismiss the claim under 42 U.S.C. § 3617, which makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act.  Defendants claim that Plaintiffs did not engage in protected activity and, assuming they did, Aponte did not engage in any conduct to coerce, intimidate, or threaten Plaintiffs for exercising their rights under the FHA.  Plaintiffs respond that the protected activity includes asserting the "right to reside in one's home without discriminatory harassment."

Section 3617 is a familiar anti-retaliation statute.  To prevail under § 3617, Plaintiffs need not prove that A.R. was disabled within the meaning of the FHA.  Bloch v. Frischholz, 587 F.3d 771, 782 (7th Cir. 2009).  To state a retaliation claim, Plaintiffs must show that they engaged in protected activity, that Defendants were aware of that activity, that Defendants took adverse action against Plaintiff, and there is a causal connection between the protected activity and the adverse action.  Regional Economic Community Action Program, Inc v. City of Middletown, 294 F.3d 35, 54 (2d Cir. 2002).

The first element in a § 3617 claim requires proof of a protected activity.  Plaintiffs claim that protected activity includes asserting the right to reside in one's home without discriminatory harassment.  The Court agrees that this may constitute protected activity.

Thus, a trier of fact could reasonably conclude that Plaintiffs' plea that Aponte stop harassing them on account of A.R.'s disability constituted protected activity.[7] The Court also finds that there are questions of fact whether Defendants took adverse action and whether there is a causal connection between any protected activity and any adverse action.

On the one hand, Aponte made eviction threats before the alleged protected activity. On February 4, 2011, Aponte sent a text stating "[s]hould I assume you will be leaving at end of month?" At this point in time, even assuming Aponte had knowledge of A.R.'s medical condition, there is nothing suggesting that Aponte's text message was in any way related to A.R.'s medical condition or the exercise of any rights under the FHA. Thereafter, Aponte continued her attempts to have Plaintiffs respond. By text message dated February 7, Aponte arguably references A.R.'s medical condition ("we are both sympathetic to your situation. . . ."), but states that A.R.'s medical condition "does not change the fact that we are selling the property. . . ." Aponte continued to write that "you have been given ample notice I will be proceeding with legal action to remove you from premises You've known from the beginning that the property has been on the market." Thus, at this point in time, Aponte threatened legal action to remove Plaintiffs from the property before Plaintiffs engaged in any conduct that may reasonably be deemed to be protected activity. It was not until February 12 that Plaintiffs first arguably engaged in protected activity.[8] Once Plaintiff

_____

[7] To the extent Plaintiffs seek summary judgment on this claim, the Court finds that triable issues of fact remain concerning the motive behind Heidi Rodriguez's statements and whether she was opposing practices she believed to be unlawful or otherwise exercising rights protected by the FHA.

[8] By text message dated February 12, 2011, Heidi Rodriguez writes:

We are not leaving. Where do you want us to go with a sick child? . . . Why do you keep harassing and insisting that we move. . . . When you were told of my daughter being sick we weren't asking for free rent or anything of the sort. Just to be understood and left alone to deal
(continued...)

raised the issues concerning her daughter, Aponte responsed "I have not asked you to leave! You made no response to agreeing to the terms of the new owner. . . ."  Up to this point, it appears that Aponte's motives were related entirely to ensuring the successful sale of the property.

Thereafter, however, in response to Heidi Rodriguez's statements about her daughter's illness and wanting to be left alone, Aponte made statements that could reasonably be said to have been threatening in nature and/or interfering with Plaintiffs' rights under the FHA.  Aponte stated on several occasions that the prospective owner would probably not want to rent to Plaintiffs because of A.R.'s medical situation.  Aponte even went so far as to state that "I think we need to let you know that we will not be renting to you! Please plan on rel Please make plans to relocate.  We will give you Until end of March." Aponte similarly stated that "[t]he new owner has decided not to continue to rent to you because your daughter should be in a more convenient location to medical treatment." Aponte also sought verification of A.R.'s illness and stated "I think your tenancy is over." While it may be that Aponte spoke out of frustration, the difficulty in getting Plaintiffs respond, and her desire to ensure the sale of the property without interference from Plaintiffs, given the timing and nature of Aponte's statements, a fair-minded trier of fact could reasonably conclude that she intimidated, threatened, or interfered with Plaintiffs' enjoyment of a right granted or protected by the FHA on account of Plaintiffs' opposing an act or practice made unlawful by the FHA.  See 24 C.F.R. § 100.400 (defining retaliation to include "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the . . .

---

[8](...continued)
    with her medical issues without being bothered by you asking us to leave our home."

handicap . . . of such persons, or of visitors or associates of such persons."); see also Bloch, 587 F.3d at 782 (threats of eviction violate § 3617 even if the eviction does not come to fruition).  For the foregoing reasons, the Court finds triable issues of fact on the § 3617 claim.

### c.        Punitive Damages

Defendants also move to dismiss the claim for punitive damages against Defendant VGR and Aponte.  The basis of the argument as to VGR is that there is insufficient evidence that it was sufficiently involved in any unlawful conduct so as to render it liable for punitive damages.  Indeed, the Second Circuit has "necessarily recognized the general rule that where punitive damages are to be imposed, the principal must be shown to be somehow involved in the wrongdoing." J.C.B. Super Markets, Inc. v. United States, 530 F.2d 1119, 1122 (2d Cir. 1976).  While there is a dearth of evidence in the record suggesting actual involvement by VGR, Defendants have failed to sustain their burden of demonstrating the absence of a triable issue of fact on this issue.  Defendants cite only to page 107 of the Lonergan deposition in support of their claim that VGR "did not authorize the alleged discriminatory conduct as VGR was never even aware of such alleged conduct until receiving Plaintiff's formal complaint in May of 2011."  This page reference does not support the claimed factual assertion.  Accordingly, it cannot be said at this time that there is insufficient evidence upon which a fair-minded trier of fact could reasonably conclude that VGR engaged in conduct justifying an award of punitive damages.

The basis for the motion to dismiss the claim for punitive damages as to Aponte is Plaintiffs' stipulation that they would not "seek recovery from [Aponte], instead seeking it only from Village Green" in obtaining a partial lift of the Bankruptcy stay.  Defendants argue that this stipulation moots the claims against Aponte.  Plaintiffs respond that the claims against

her are not moot, but only that they would not enforce any judgment as against her personally. The Court agrees with Plaintiffs that the stipulation does not preclude judgment against Aponte, but does prohibit executing on that judgment as against her.

### d. Whether Aponte was an Agent of VGR

The last issue concerns Plaintiffs' motion to establish that VGR is vicariously liable for Aponte's actions. Defendants have not opposed this portion of Plaintiffs' motion.

Plaintiffs correctly assert that "[t]he Fair Housing Act imposes liability without fault on employers in accordance with traditional agency principles." Mitchell v. Shane, 350 F.3d 39, 50 (2d Cir. 2003). "Agency is a legal concept that depends on the existence of three elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking. Cleveland v. Caplaw Enterprises, 448 F.3d 518, 522 (2d Cir. 2006) (internal quotations and citation omitted). Here, the record adequately establishes that there was sufficient manifestation by VGR that Aponte would act on its behalf in connection with the sale of the Yaeger property; Aponte accepted this undertaking; and the parties understood that VGR was in control of the undertaking. See generally Pls.' Stmnt. of Mat. Facts at ¶¶ 3-38, 42. This is sufficient to establish a principal-agent relationship.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. The motion is granted insofar as all claims are dismissed with the exception of the retaliation claim. Plaintiffs' cross-motion for summary judgment is granted

insofar as the Court finds that VGR is vicariously liable for Aponte's actions and is denied in all other respects.

IT IS SO ORDERED.

Dated: October 10, 2013

Thomas J. McAvoy
Senior, U.S. District Judge

TEXT MESSAGES BETWEEN HEIDI RODRIGUEZ AND BLANCA APONTE (Messages from Rodriguez are italicizes):

1/25/2011 - 12:20pm

Please let me know, as soon as possible, a response to letters I sent. If you have an attorney please have him/her contact me. Thanks!

2/4/2011-12:03pm

Should I assume vou will be leaving at end of month? I also need to do a visual inspection of the hous this coming week Please give me a couple of dates and time so I can schedule to come over! Thanks!!

2/7/2011 - 2:15pm

Hi Please respond to my notices! If vou have an attorney please have them get in touch w me

*Please call Donnie for an update.*

Will do

Just spoke w Donnie. While we are both sympathetic to your situation, it does not change the fact that we are selling the property and vou have been given ample notice I will be proceeding with legal action to remove you from premises You've known from the beginning that the property has been on the market

2/8/2011 - 7:43pm

*2/18 or 2/22 for the visual inspection. 1 pm is the best time.*

How is 1:45 on 18th. U also need to confirm that u are leaving bv 3/15

JPEG2000 and JBIG2 image formats are not supported.

**2/12/2011 - 10:17am**

*2/18 @ 1:45 will be fine. We are not leaving. Where do you want us to go with a sick child? I thought the new owner wanted renters? Why do you keep on harassing and insisting that we move? I have paid the rent on time and have not used our security or other deposit. When you were told of my daughter being sick we weren't asking for free rent or anything ofthe sort. Just to be understood and left alone to deal with her medical issues without being bothered by you asking us to leave our home.*

**2/12/2011 - 10:49am**

I have not asked vou to leave I You made no response to agreeing to the terms ofthe new owner which include removal of stored items in garage! In fact the only response I got from vou is about the inspection I plan to do the 18th for the buyer!

*It's funny how I can barely get my vehicle up the poorly maintained icy road - not to mention how many people got their cars stuck. How should I get a moving vehicle up here? Or better yet an ambulance for my daughter if needed?*

**2/12/2011 - 11:08am**

This has nothing to do with what we were just speaking about Fact is that if I can get up and down emergency vehicles should be able to as well. This has been an unusually cold and snow filled Winter. So maybe vou should consider relocating to a better and more easily accessible Location. I will see vou on the 18th at 1:45

**2/16/2011 - 1:32pm**

Confirming appointment for tomorrow 1:45. Also let me know if you have made arrangements to remove your property from garage. Blanca

**2/16/2011-4:26pm**

*Just to clarify the appt was for Friday not Thursday - and sorry in advance but I must cancel. My daughter had another seizure and she has to go to Vassar Hosp on Friday for testing. Can you make it on Tuesday 2/22 same time?*

JPEG2000 and JBIG2 image formats are not supported.

U r right, I meant Frday. What time are u back from appointment? How about your husband? Saturday works as well. Have you arranged for storage?

**2/16/2011 - 5:24pm**

*I'm not sure what time we will get back from Vassar on Friday. My husband is working and Saturday doesn't work for either of us. We are looking into storage now - when is the final date that Monsur is signing paperwork or will be taking over? I thought ur letter said March 15th? The pop up trailer is frozen to the ground - we should be able to have it removed by late March or early April after the snow melts. I was hoping to have until then to remove the garage things as well.*

I will speak to him, but he wants pictures and his demands met before signing contracts I will speak to Donnie.

*K. 2/22, 2/25, or 2/24 (later that day) work.*

Will get back to you

**2/16 - 6:29pm** *Ok.*

**2/16/2011 - 7:42pm**

Just spoke w my lawyer for management company.. We will accept your rescheduling appointment for Friday if you provide verification of medical appointment for your daughter. The prospective new owner is very concerned about continuing your lease with you Childs medical situation and will probably not want to rent to you. I think we need to let you know that we will not be renting to you I Please plan on rel Please make plans to relocate. We will give you Until end of March. Respond to me.. Not to mr Morelli Blanca

**2/16/2011-8:16pm**

*What are you talking about?*

JPEG2000 and JBIG2 image formats are not supported.

**2/16/2011 - 8:42pm**

Exactly what I said. You have cancelled our appointment because of issues with your daughter's illness. We want verification of your appointment. That being said... The new owner has decided not to continue to rent to vou because your daughter should be in a more convenient location to medical treatment

**2/16/2011-9:04pm**

*You spoke to the new owner that fast and he made a decision not to rent to us because my daughter has seizures? Or is this you decision ?*

*I am confused.*

**2/17/2011-7:11am**

The new owner is concerned bv vour statement that emergency vehicles cannot reach vou should vour daughter be at risk. Also concerned about vou not making place readily available for inspection and thinks I should have a key that is the right of a landlord and his representative. For me, I only have vour statement-that vour daughter us sick Do u have verification?

**2/23/2011 - 7:37pm**

What time tomorrow?

*You said Friday.*

That was Friday last week which u canceled

**2/23/2011-8:04pm**

*Sure. I remember clearly. I then gave you dates to reschedule and you reply was that we needed to move out by the end of March because of our daughters medical issue. You never confirmed with me another date to come In and take pictures.*

**2/23/2011-8:32pm**

Yes I neverconfirmed new date! However, I said the new owner was concerned about renting to you because of your statement that it was not a readily accessible to emergency vehicles! In fact he is convened about being a landlord to both houses because of issues concerning u guvs!!!

Byway. U did not respond! Are. Leaving or attempting to stay even though u said conditions are not good for your daughter and I also asked for verification of doctors appointment last Friday. Please submit

*Are you saying I have an issue with Tammy or are you saying that you have issues with Tammy and with us separately?*

No! I am saving the buyer is having issues about buying a property that includes tenants... period I

*/ did not respond to what? Just to clarify I never said conditions are not good for my daughter. I was saying the condition ofthe road was not optimal for us to get a moving vehicle up here to move the stuff from the garage. The garage that you changed the lock to on 2/19 - Saturday. Thus of which our property is still in.*

~


**2/23/2011-8:46pm**

*/ was told the new buyer wanted tenants. When did he change his mind?*

JPEG2000 and JBIG2 image formats are not supported.

**2/23/2011-9:03pm**

When all these concerns came up about your daughter being seriously ill and emergency vehicles not being able to get to her! That is of major concern as to liability which vou raised!! The fact that with notice, the place is not readily available for inspections You have not arranged for removal of things vou stored in garage at no cost and as a temporary arrangement w current owner who also wants vou to arrange for other storage

*Donnie Morrelli has never said anything about us moving our stuff out of the garage. This was a demand ofthe prospective buyer I thought? As far as an inspection goes -1 have only cancelled once. My family and I are busy like many people - that is why it is important to setup an appointment.*

**2/23/2011 - 9:15pm**

I will be speaking to Donnie tomorrow. I hope you saved all our text conversations as I have. Do vou have verification of doctor's appointment last Friday? Verification of daughter's illness? I think that vour tenancy is over. Will verify after speaking to both Donnie and buyer

**2/23/2011-9:36pm**

*Why would you think our tenancy is over? Donnie Morrelli has never asked us to leave or move our stuff from the garage. He is the current owner and he has never lead us to believe he wanted us to move.*

Please speak to him about that

Goodnight

**2/24/2011-9:00am**

FYI Donnie changed lock on garage door in anticipation of u moving stuff out I will be

there at 2:30 tomorrow at request of Donnie as well

**2/24/2011 - 3:37pm**

Please confirm tomorrow at 2:30

JPEG2000 and JBIG2 image formats are not supported.

**2/24/2011-7:38pm**

I can be there at **4**:30 tomorrow, Please confirm

**2/25/2011 - 9:24am**

I understand schools are closed. Let me know if 2:30 works. Or if **4**:30 is better today

**2/25/2011 - 10:18am**

*My phone died last night. Otherwise I would have replied. Saturday at 4:30 works best. I don't fore-see any reason to cancel. And yes my daughters school was cancelled but mine is not.* Will be there *Ok.*

**2/25/2011-5:23pm**

*Who's responsible fir plowing? We have over 4 inches and I am stuck!*

**2/25/2011-5:48pm**

Who has plowed in the past? I will call don *Mike.*

Trying to get Donnie. What does vour lease say?

**3/31/2011 - 6:11pm**

Hi, hope your daughter is well! Donnie wants me to collect the rent tomorrow. He also asked me to remind vou that if the trailer is not removed bv this weekend vou will be paving an additional $50 Per month

**4/1/2011 - 10:29am**

Please respond

**4/2/2011-9:53am**

*It's been mailed to the owner - Donnie Morrelli. The trailer will be moved soon. I would like to speak to the prospective buyer - please give him my information. Please do not contact me any further.*

The perspective buyer is away and dealing with a lot of issues with family in the middle east. One of the aspects of this purchase is that I manager this property as he does not want to have contact with tenants. Presently, I represent Donnie Morelli. As his agent, vou have no choice as to communication with me as I am following vour landlords instructions. In the future, I will be collecting rent at a mutually convenient time on the first of month. I will have Donnie give you a letter to this effect. Thanks fir vour anticipated